635 F.2d 342
 S-1, a minor, by and through his mother and next friend, P-1
et al., Plaintiffs-Appellees,
v.
Ralph D. TURLINGTON, individually, and in his official
capacity as Commissioner of Education, State of
Florida, Department of Education et al.,
Defendants- Appellants.
 No. 79-2742.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 Jan. 26, 1981.
 James D. Little, State Bd. of Ed., Tallahassee, Fla., for Ralph Turlington et al.
 John W. Bowen, Orlando, Fla., for James C. Edwards and School Bd. of Hendry County, Fla.
 Jacob A. Rose, Florida Rural Legal Services, Inc., Belle Glade, Fla., for plaintiffs-appellees.
 Mark L. Gross, Atty., Appellate Section, Civ. Rights Div., Dept. of Justice, Washington, D.C., for the U. S. amicus curiae.
 Appeals from the United States District Court for the Southern District of Florida.
 Before VANCE, HATCHETT and ANDERSON, Circuit Judges.
 HATCHETT, Circuit Judge.
 
 
 1
 In this appeal, we are called upon to decide whether nine handicapped students were denied their rights under the provisions of the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401-1415, or section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, and their implementing regulations. The trial court found a denial of rights and entered a preliminary injunction against the state and local officials. Defendants attack the trial court's entry of a preliminary injunction as an abuse of discretion. Because we find that the trial court did not abuse its discretion in entering the preliminary injunction, we affirm.
 
 FACTS
 
 2
 Plaintiffs, S-1, S-2, S-3, S-4, S-5, S-6, and S-8, were expelled from Clewiston High School, Hendry County, Florida, in the early part of the 1977-78 school year for alleged misconduct.[1] Each was expelled for the remainder of the 1977-78 school year and for the entire 1978-79 school year, the maximum time permitted by state law. All of the plaintiffs were classified as either educable mentally retarded (EMR), mildly mentally retarded, or EMR/dull normal. It is undisputed that the expelled plaintiffs were accorded the procedural protections required by Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Except for S-1, they were not given, nor did they request, hearings to determine whether their misconduct was a manifestation of their handicap. Regarding S-1, the superintendent of Hendry County Schools determined that because S-1 was not classified as seriously emotionally disturbed, his misconduct, as a matter of law, could not be a manifestation of his handicap.
 
 
 3
 At all material times, plaintiffs S-7 and S-9 were not under expulsion orders. S-7 was not enrolled in high school by his own choice. In October, 1978, he requested a due process hearing to determine if he had been evaluated or if he had an individualized educational program. S-9 made a similar request in October, 1978. Shortly before her request, S-9's guardian had consented to the individualized educational program being offered her during that school year. The superintendent denied both student's requests, but offered to hold conferences in order to discuss the appropriateness of their individualized educational programs.
 
 
 4
 Plaintiffs initiated this case alleging violations of their rights under the Education for all Handicapped Children Act, (EHA) 20 U.S.C. §§ 1401-1415, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiffs sought preliminary and permanent injunctive relief compelling state and local officials to provide them with the educational services and procedural rights required by the EHA, section 504, and their implementing regulations.
 
 TRIAL COURT DECISION
 
 5
 The trial court found that the EHA, effective in Florida on September 1, 1978, provided all handicapped children the right to a free and appropriate public education. The court further found that the expelled students were denied this right in violation of the EHA. In addition, the trial court decided that under section 504 and the EHA, no handicapped student could be expelled for misconduct related to the handicap. That in the case of S-2, S-3, S-4, S-5, S-6, and S-8, no determination was ever made of the relationship between their handicaps and their behavioral problems. With regard to S-1, the trial court found that the superintendent's determination was insufficient under section 504 and the EHA. The court reasoned that an expulsion is a change in educational placement. That under the educational placement procedures of section 504 and the EHA, only a trained and specialized group could make this decision. For these reasons, the trial court concluded that a likelihood of success on the merits had been shown with respect to the expelled plaintiffs.
 
 
 6
 With regard to S-7 and S-9, the trial court stated that under 20 U.S.C. § 1415(b)(1)(E),[2] students and their parents or guardians must be provided "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." That under 20 U.S.C. § 1415(b)(2),[3] "whenever such a complaint has been received, the parents or guardians shall have an opportunity for an impartial due process hearing." The trial court found that the superintendent's failure to grant S-7 and S-9 impartial due process hearings contravened the express provisions of the EHA. The court therefore concluded that S-7 and S-9 had shown a likelihood of success on the merits of their claim.
 
 
 7
 Finally, the trial court found that the plaintiffs had suffered irreparable harm in that two years of education had been irretrievably lost. The court further determined that an injunction was necessary to ensure that plaintiffs would be provided their rights, even though the expulsions had expired at the time the injunction was entered.
 
 STATEMENT OF ISSUES
 
 8
 In an appeal from an order granting preliminary relief, the applicable standard of review is whether the issuance of the injunction, in light of the applicable standard, constitutes an abuse of discretion.[4] Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); Canal Authority of State of Florida v. Callaway, 489 F.2d 567 (5th Cir. 1974). Therefore, in order to decide whether the trial court abused its discretion in entering the preliminary injunction, we must resolve the following issues: (1) whether an expulsion is a change in educational placement thereby invoking the procedural protections of the EHA and section 504; (2) whether the EHA, section 504, and their implementing regulations contemplate a dual system of discipline for handicapped and non-handicapped students; (3) whether the burden of raising the question, whether a student's misconduct is a manifestation of the student's handicap, is on the state and local officials or on the student; (4) whether the EHA and its implementing regulations required the local defendants to grant S-7 and S-9 due process hearings; and, (5) whether the trial judge properly entered the preliminary injunction against the state defendants.
 
 DISCUSSION
 
 9
 Section 504 of the Rehabilitation Act and the EHA have been the subject of infrequent litigation. No reported appellate cases deal with these acts and the issues presented in the instant case. Therefore, a review of these statutes and their pertinent regulations is necessary to the disposition of this controversy.
 
 
 10
 Section 504, effective in Florida four months prior to the expulsions in question, provides:No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance....
 
 
 11
 Under 29 U.S.C. § 706(7)(B), a handicapped individual is defined as "any person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities ...."
 
 
 12
 Under the EHA, 20 U.S.C. § 1412(1)[5] and (5)(B),[6] effective in Florida on September 1, 1978, a state receiving financial assistance under this Act is required to provide all handicapped children a free and appropriate education in the least restrictive environment. The definition of handicapped children under the EHA is similar to the definition under section 504.
 
 
 13
 Florida, and the Hendry County School Board, are recipients of federal funds under both section 504 and the EHA. The children in this suit are clearly handicapped within the meaning of both section 504 and the EHA. The parties agree that a handicapped student may not be expelled for misconduct which results from the handicap itself. It follows that an expulsion must be accompanied by a determination as to whether the handicapped student's misconduct bears a relationship to his handicap. From a practical standpoint, this is the only logical approach. How else would a school board know whether it is violating section 504?
 
 
 14
 Defendant local officials argue that they complied with section 504. As support for their position, they state that they determined, in the expulsion proceedings, that the plaintiffs were capable of understanding rules and regulations or right from wrong. They also assert that they found, based upon a psychological evaluation, that plaintiffs' handicaps were not behaviorial handicaps (as it would be if plaintiffs were classified as seriously emotionally disturbed), thereby precluding any relationship between the misconduct and the applicable handicap. We cannot agree that consideration of the above factors satisfies the requirement of section 504. A determination that a handicapped student knew the difference between right and wrong is not tantamount to a determination that his misconduct was or was not a manifestation of his handicap. The second prong of the school officials' argument is unacceptable. Essentially, what the school officials assert is that a handicapped student's misconduct can never be a symptom of his handicap, unless he is classified as seriously emotionally disturbed. With regard to this argument, the trial court stated:
 
 
 15
 The defendants concede that a handicapped student cannot be expelled for misconduct which is a manifestation of the handicap itself. However, they would limit application of this principle to those students classified as "seriously emotionally disturbed." In the Court's view such a generalization is contrary to the emphasis which Congress has placed on individualized evaluation and consideration of the problems and needs of handicapped students.
 
 
 16
 We agree. In addition, the uncontradicted testimony elicited at the preliminary injunction hearing suggests otherwise. At the hearing, a psychologist testified that a connection between the misconduct upon which the expulsions were based and the plaintiffs' handicaps may have existed. She reasoned that "a child with low intellectual functions and perhaps the lessening of control would respond to stress or respond to a threat in the only way that they feel adequate, which may be verbal aggressive behavior." She further testified that an orthopedically handicapped child, whom she had consulted,
 
 
 17
 (w)ould behave in an extremely aggressive way towards other children and provoke fights despite the fact that he was likely to come out very much on the short end of the stick. That this was his way of dealing with stress and dealing with a feeling of physical vulnerability. He would be both aggressive and hope that he would turn off people and as a result provoke an attack on him.
 
 
 18
 The record clearly belies the school officials' contention.
 
 FIRST ISSUE
 
 19
 With regard to plaintiff S-1, the trial court found that the school officials entrusted with the expulsion decision determined at the disciplinary proceedings that S-1's misconduct was unrelated to his handicap. The trial court, however, held that this determination was made by school board officials who lacked the necessary expertise to make such a determination. The trial court arrived at this conclusion by holding that an expulsion is a change in educational placement. Under 45 CFR § 121a.533(a)(3)[7] and 45 CFR § 84.35(c)(3),[8] evaluations and placement decisions must be made by a specialized and knowledgeable group of persons.
 
 
 20
 The trial court's finding presents the novel issue in this circuit whether an expulsion is a change in educational placement, thereby invoking the procedural protections of both the EHA and section 504 of the Rehabilitation Act. In deciding this issue, the EHA and section 504, as remedial statutes, should be broadly applied and liberally construed in favor of providing a free and appropriate education to handicapped students.
 
 
 21
 The EHA, section 504, and their implementing regulations do not provide this court any direction on this issue. We find the reasoning of the district court in Stuart v. Nappi, 443 F.Supp. 1235 (D.Conn.1978), persuasive. In Stuart, a child was diagnosed as having a major learning disability caused by either a brain disfunction or a perceptual disorder. She challenged the use of disciplinary proceedings which, if completed, would have resulted in her expulsion for participating in a schoolwide disturbance. The trial court held that the proposed expulsion constituted a change in educational placement, thus requiring the school officials to adhere to the procedural protections of the EHA. In so holding, the court stated:
 
 
 22
 The right to an education in the least restrictive environment may be circumvented if schools are permitted to expel handicapped children (without following the procedures prescribed by the EHA).... An expulsion has the effect not only of changing a student's placement, but also of restricting the availability of alternative placements. For example, plaintiff's expulsion may well exclude her from a placement that is appropriate for her academic and social development. This result flies in the face of the explicit mandate of the handicapped act which requires that all placement decisions be made in conformity with a child's right to an education in the least restrictive environment. (Citation omitted.)
 
 
 23
 443 F.Supp. at 1242-43.
 
 
 24
 We agree with the district court in Stuart, and therefore hold that a termination of educational services, occasioned by an expulsion, is a change in educational placement, thereby invoking the procedural protections of the EHA.
 
 
 25
 The proposition that an expulsion is a change in educational placement has been cited with approval in Sherry v. New York State Education Department, 479 F.Supp. 1328 (W.D.N.Y.1979) (legally blind and deaf student that suffered from brain damage and emotional disorder which made her self abusive suspended because of insufficient staff to care for her), and Doe v. Koger, 480 F.Supp. 225 (N.D.Ind.1979) (EHA case in which mildly mentally handicapped student was expelled for the remainder of school term for disciplinary reasons pursuant to the procedures provided for all Indiana public school disciplinary expulsions). As stated by the district court in Doe v. Koger, our holding that expulsion of a handicapped student constitutes a change in educational placement distinguishes the handicapped student in that, "unlike any other disruptive child, before a disruptive handicapped child can be expelled, it must be determined whether the handicap is the cause of the child's propensity to disrupt. This issue must be determined through the change of placement procedures required by the handicapped act." Doe v. Koger, 480 F.Supp. at 229.[9]
 
 SECOND ISSUE
 
 26
 The school officials point out that a group of persons entrusted with the educational placement decision could never decide that expulsion is the correct placement for a handicapped student, thus insulating a handicapped student from expulsion as a disciplinary tool. They further state that Florida law does not contemplate this result because expulsion is specifically provided for under Florida law as a disciplinary tool for all students. While the trial court declined to decide the issue whether a handicapped student can ever be expelled, we cannot ignore the gray areas that may result if we do not decide this question. We therefore find that expulsion is still a proper disciplinary tool under the EHA and section 504 when proper procedures are utilized and under proper circumstances. We cannot, however, authorize the complete cessation of educational services during an expulsion period.
 
 THIRD ISSUE
 
 27
 State defendants focus their attention on the fact that, with the exception of S-1, none of the expelled plaintiffs raised the argument, until eleven months after expulsion, that they could not be expelled unless the proper persons determined that their handicap did not bear a causal connection to their misconduct. By this assertion, we assume that state defendants contend that the handicapped students waived their right to this determination. The issue is therefore squarely presented whether the burden of raising the question whether a student's misconduct is a manifestation of the student's handicap is on the state and local officials or on the student. The EHA, section 504, and their implementing regulations do not prescribe who must raise this issue. In light of the remedial purposes of these statutes, we find that the burden is on the local and state defendants to make this determination. Our conclusion is buttressed by the fact that in most cases, the handicapped students and their parents lack the wherewithal either to know or to assert their rights under the EHA and section 504.
 
 FOURTH ISSUE
 
 28
 The next issue is whether the EHA and its implementing regulations required the local defendants to grant S-7 and S-9 due process hearings. The school officials suggest that because S-7 had voluntarily withdrawn from school, he was not entitled to a due process hearings. With regard to S-9. the school officials assert that because she had previously agreed to the educational program being offered her during the school year, she was not entitled to a due process hearing. They also suggest that the conference offered by the superintendent was an adequate substitute for the due process hearings. They cite 45 CFR 121a.506[10] as support for their argument. Under this regulation, the Department of Health, Education and Welfare (HEW) (now Health and Human Services), states in a comment that mediation can be used to resolve differences between parents and agencies without the development of an adversarial relationship.
 
 
 29
 The Justice Department, as amicus curiae, and the trial court, point out that under 20 U.S.C. § 1415(b)(1), parents and guardians of handicapped children must have "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." (Emphasis added.) The statute also states, in section 1415(b), that "whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing...." No exception is made for handicapped students who voluntarily withdraw from school or previously agree to an educational placement. With regard to defendants' argument under 45 CFR § 121a.506, HEW states in the same comment that mediation may not be used to deny or delay a parent's rights under this subpart. In the circumstances, the trial judge correctly found that plaintiffs S-7 and S-9 were entitled to due process hearings.
 
 FIFTH ISSUE
 
 30
 State defendants advance three arguments that deserve comment. First, they assert that the trial judge erred in analyzing section 504 in light of the Supreme Court's decision in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In that case, the issue was whether section 504, which prohibits discrimination against an otherwise qualified handicapped individual enrolled in a federally funded program, solely by reason of his handicap, forbids professional schools from imposing physical qualifications for admission to their clinical training program. The Supreme Court held that section 504 did not forbid professional schools from imposing physical qualifications for admission. Without discussing Southeastern any further, it is clear that it does not apply to this case. Physical qualifications are not at issue in this case. Furthermore, we do not deal here with a professional school.
 
 
 31
 Secondly, state defendants argue that the trial court erred in imposing the EHA as a requirement at the time of the expulsions because the EHA was not effective in Florida until September 1, 1978. The trial court did not impose the EHA as a requirement at the time of the expulsion. The court found that the expelled plaintiffs became entitled to the protections of the EHA on September 1, 1978. As such, the expelled plaintiffs became entitled to a free and appropriate education in the least restrictive environment. In fact, under 20 U.S.C. § 1412(3),[11] because plaintiffs were not receiving educational services on September 1, 1978, they fell within a special class of handicapped students entitled to priority regarding the provision of a free and appropriate education. The only way in which the expulsions could have continued as of September 1, 1978, is if a qualified group of individuals determined that no relationship existed between the plaintiffs' handicap and their misconduct. Furthermore, section 504, effective at the time of the expulsions, provides protections and procedures similar to those of the EHA. See North v. District of Columbia Board of Education, 471 F.Supp. 136 (D.D.C.1979).
 
 
 32
 Finally, the state officials argue that the trial court improperly entered the injunction against them. They assert that they lacked the authority to intervene in the expulsion proceedings because disciplinary matters are exclusively local. While this argument may be true regarding non-handicapped students, it is inapplicable to handicapped students. Expulsion proceedings are of the type that may serve to deny an education to those entitled to it under the EHA. Under 20 U.S.C. § 1412(6), the state educational agency is:
 
 
 33
 Responsible for assuring that the requirements of this sub-chapter be carried out and that all educational programs for handicapped children within the state, including all such programs administered by any other state or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the state educational agency and shall meet educational standards of the state educational agency.
 
 
 34
 Clearly, the state officials were empowered to intervene in the expulsion proceedings under 20 U.S.C. § 1412(6).
 
 CONCLUSION
 
 35
 Accordingly, we hold that under the EHA, section 504, and their implementing regulations: (1) before a handicapped student can be expelled, a trained and knowledgeable group of persons must determine whether the student's misconduct bears a relationship to his handicapping condition; (2) an expulsion is a change in educational placement thereby invoking the procedural protections of the EHA and section 504; (3) expulsion is a proper disciplinary tool under the EHA and section 504, but a complete cessation of educational services is not; (4) S-7 and S-9 were entitled to due process hearings; and, (5) the trial judge properly entered the preliminary injunction against the state defendants. In the circumstances, the trial judge did not abuse his discretion in entering the injunction.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 The misconduct upon which the expulsions were based ranged from masturbation or sexual acts against fellow students to willful defiance of authority, insubordination, vandalism, and the use of profane language
 
 
 [2]
 20 U.S.C. § 1415(b)(1)(E) provides:
 (b)(1) The procedures required by this section shall include, but shall not be limited to:
 (E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.
 
 
 [3]
 20 U.S.C. § 1415(b)(2) provides:
 (2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the education or care of the child.
 
 
 [4]
 Prerequisites for the granting of a preliminary injunction are: (1) substantial likelihood that plaintiff will prevail on the merits; (2) substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) threatened injury to plaintiff outweighs threatened harm injunction may do to defendants; and, (4) absence of disservice to the public interest if the injunction should be granted. Canal Authority of State of Florida v. Callaway, 489 F.2d 567 (5th Cir. 1974). Defendants only seriously challenge the trial court's findings regarding the first two prerequisites. Accordingly, we confine our discussion to those elements
 
 
 [5]
 20 U.S.C. § 1412(1) provides:
 In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:
 (1) The State has in effect a policy that assures all handicapped children the right to a free appropriate public education.
 
 
 [6]
 20 U.S.C. § 1412(5)(B) provides:
 In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:
 (5) The State has established ... (B) procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature of severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily(.)
 
 
 [7]
 45 C.F.R. § 121a.533(a)(3) provides in pertinent part that:
 (a) In interpreting evaluation data and in making placement decisions, each public agency shall:
 (3) Insure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options ....
 
 
 [8]
 45 C.F.R. § 84.35(c)(3) provides in pertinent part that:
 (c) In interpreting evaluation data and in making placement decisions, a recipient shall
 (3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options.
 
 
 [9]
 This opinion does not infringe upon the traditional authority and responsibility of the local school board to ensure a safe school environment. A comment to the regulations provides: "While the placement may not be changed, this does not preclude dealing with children who are endangering themselves or others." 45 C.F.R. § 121(a). 513 (comment). Thus the local school board retains the authority to remove a handicapped child from a particular setting upon a proper finding that the child is endangering himself or others. In such case, the child would of course be remanded to the special change of placement procedures for reassignment to an appropriate placement. It is appropriate to superimpose this very limited authority, as contemplated by the above quoted comment, because nothing in the statute, the regulations, or the legislative history suggests that Congress intended to remove from local school boards-who alone are accountable to the entire school community-their long-recognized authority and responsibility to ensure a safe school environment
 
 
 [10]
 The comment to 45 C.F.R. 121a.506 implementing 20 U.S.C. § 1416(b)(2) provides:
 Comment : Many States have pointed to the success of using mediation as an intervening step prior to conducting a formal due process hearing. Although the process of mediation is not required by the statute or these regulations, an agency may wish to suggest mediation in disputes concerning the identification, evaluation, and educational placement of handicapped children, and the provision of a free appropriate public education to those children. Mediations have been conducted by members of State educational agencies or local educational agency personnel who were not previously involved in the particular case. In many cases, mediation leads to resolution of differences between parents and agencies without the development of an adversarial relationship and with minimal emotional stress. However, mediation may not be used to deny or delay a parent's rights under this subpart.
 
 
 [11]
 20 U.S.C. § 1412(3) provides in pertinent part that:
 In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:
 (3) The State has established priorities for providing a free appropriate public education to all handicapped children ... first with respect to handicapped children who are not receiving an education(.)